UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

J.D. on behalf of A.P.,

                 Plaintiff,

    - against -

NEW YORK CITY DEPARTMENT OF
EDUCATION, and CARMEN FARIÑA, in her
capacity as Chancellor of the New York City School
District,

                 Defendants.

**OPINION AND ORDER**

14 Civ. 9424 (ER)

---

Appearances:

Caroline J. Heller
Greenberg Traurig, LLP
New York, NY
*Attorney for Plaintiff*

Zachary W. Carter
William B. Scoville, Jr.
Corporation Counsel of the City of New York
New York, NY
*Attorneys for Defendants*

Ramos, D.J.:

       J.D. ("Plaintiff") is the mother of A.P., a seventeen year-old New York City student

classified with a speech and language impairment. A.P. attended sixth grade during the 2011-

2012 school year at a private school for students with dyslexia and other language disabilities.

Plaintiff brings this suit against the New York City Department of Education ("DOE") and

Carmen Fariña in her official capacity as the DOE Chancellor under the Individuals with

Disabilities Education Act ("IDEA"), seeking funding of the tuition owed to the private school

for the 2011-2012 year. Plaintiff claims entitlement to the tuition based on the DOE's alleged

failure to offer A.P. a free appropriate public education for his sixth-grade year, as the IDEA

required.  Plaintiff also seeks damages for the DOE's alleged discrimination under Section 504

of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

Before this Court are the parties' cross-motions for summary judgment.  (Docs. 14, 20).[1]

For the reasons set forth below, Plaintiff's motion for summary judgment is DENIED and the

DOE's motion for summary judgment is GRANTED.


# I. STATUTORY FRAMEWORK

## A. The IDEA

Congress enacted the IDEA to encourage the education of children with disabilities.

*E.A.M. ex rel. E.M. v. N.Y.C. Dep't of Educ.*, 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1

(S.D.N.Y. Sept. 29, 2012) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  The statute

mandates that any state receiving federal funds must provide a free appropriate public education

("FAPE") to children with disabilities.  20 U.S.C. § 1412(a)(1)(A) (2012); *Rowley*, 458 U.S. at

179.  The FAPE provided by the state must include "special education and related services"

tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and must be

"reasonably calculated to enable the child to receive educational benefits," *Rowley*, 458 U.S. at

207.

A public school ensures that a student with disabilities receives a FAPE by providing the

student with an Individualized Education Plan ("IEP").  *See Polera v. Bd. of Educ.*, 288 F.3d

478, 482 (2d Cir. 2002).  An IEP is a written statement, collaboratively developed by the parents

of the child, educators, and specialists, that "sets out the child's present educational performance,

---

[1] "Doc." references are to ECF docket numbers in Case No. 14-cv-9424.

establishes annual and short-term objectives for improvements in that performance, and

describes the specially designed instruction and services that will enable the child to meet those

objectives." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *R.E. v.

N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012)).

Because New York State receives federal funds under the IDEA, it must comply with the

requirements of the statute. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir.

1998). In New York, the task of developing an IEP rests with local Committees on Special

Education ("CSEs"), whose members are appointed by the board of education or trustees of the

school district. *Id.* (citing NY. Educ. Law § 4402(1)(b)(1); *Heldman ex rel. T.H. v. Sobol*, 962

F.2d 148, 152 (2d Cir. 1992)). "CSEs are comprised of members appointed by the local school

district's board of education, and must include the student's parent(s), a regular or special

education teacher, a school board representative, a parent representative, and others." *R.E.*, 694

F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)). "In developing a child's IEP, the CSE is

required to consider four factors: '(1) academic achievement and learning characteristics, (2)

social development, (3) physical development, and (4) managerial or behavioral needs.'"

*E.A.M.*, 2012 WL 4571794, at *1 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105,

107–08 (2d Cir. 2007)).

To provide a FAPE, an IEP must "be reasonably calculated to enable the child to receive

educational benefits," *Gagliardo*, 489 F.3d at 107 (citation and internal quotation marks

omitted), "likely to produce progress, not regression," and afford the student with an opportunity

to achieve greater than mere "trivial advancement," *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d

186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130) (internal quotation marks omitted).

"A school district is not, however, required to provide every special service necessary to

maximize each handicapped child's potential," *Cerra*, 427 F.3d at 195 (citation and internal

quotation marks omitted), or "everything that might be thought desirable by loving parents,"

*Walczak*, 142 F.3d at 132 (citation and internal quotation marks omitted).  Rather, the IDEA calls

only for selection of a program that provides a "basic floor of opportunity."  *Walczak*, 142 F.3d

at 132 (internal quotation marks omitted); *id.* at 130 ("IDEA does not itself articulate any

specific level of educational benefits that must be provided through an IEP.").  "[B]ecause public

'resources are not infinite,' federal law 'does not secure the best education money can buy; it

calls upon government, more modestly, to provide an appropriate education for each [disabled]

child.'"  *Id.* (quoting *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984)

(Ruth Bader Ginsburg, J.)); *see also C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 72

(2d Cir. 2014).  Furthermore, under an IEP, "education [must] be provided in the least restrictive

setting consistent with a child's needs" and the CSE must "be mindful of the IDEA's strong

preference for 'mainstreaming,' or educating children with disabilities to the maximum extent

appropriate alongside their non-disabled peers."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217,

224 (2d Cir. 2012) (citations and internal quotation marks omitted).

　　　In addition to imposing the IEP requirement, the IDEA provides for due process

procedures to promptly resolve disputes that arise between parents and school districts, so that

children will receive appropriate special education services.  20 U.S.C. § 1415(b)(6)–(b)(7).

New York State has implemented a two-tiered system of administrative review for disputes

regarding "any matter relating to the identification, evaluation or educational placement of a

student with a disability…or the provision of a [FAPE] to such a student."  *Id.*; 8 NYCRR §

200.5(i)(1).  First, "[p]arents may challenge the adequacy of their child's IEP in an 'impartial due

process hearing' before an [Impartial Hearing Officer ("IHO")] appointed by the local board of

education." *E.A.M.*, 2012 WL 4571794, at *2 (quoting *Gagliardo*, 489 F.3d at 109).  Either party may then appeal the IHO's decision to the New York State Review Officer ("SRO"), an officer of New York State's Board of Education tasked with conducting an impartial review of the proceedings.  *Id.*; 34 C.F.R. 300.514(b)(2); 8 NYCRR § 279.1(d).

After the SRO has rendered its decision, a federal district court must "receive the records of the administrative proceedings" and, if requested by the parties, hear additional evidence.  20 U.S.C. § 1415(i)(2)(C).  The district court then "grant[s] such relief as the court determines is appropriate," based on the preponderance of the evidence.  *Id.*  Under the statute, "appropriate" relief may include reimbursement for the cost of a private school placement.  *E.A.M.*, 2012 WL 4571794, at *2 (citations omitted).


**B. Claims for Tuition Reimbursement under the IDEA**

"'Parents who…believe that a FAPE is not being provided to their child may unilaterally enroll the child in a private school and seek tuition reimbursement from the school district' by filing what is known as a 'due process complaint.'"  *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014); citing N.Y. Educ. Law § 4404(1), 20 U.S.C. § 1412(a)(10)(C)(ii)).  Parents who unilaterally place their child in a private school do so "at their financial risk."  *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 215 (2d Cir. 2014).

"'The Supreme Court has established the three-pronged *Burlington/Carter* Test to determine eligibility for [tuition] reimbursement, which looks to (1) whether the school district's proposed plan will provide the child with a free appropriate public education; (2) whether the

parents' private placement is appropriate to the child's needs; and (3) a consideration of the equities.'" *C.F.*, 746 F.3d at 73 (citation and internal quotation marks omitted).[2]

With specific respect to the first *Burlington-Carter* prong, "challenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation." *M.O.*, 793 F.3d at 244 (quoting *R.E.*, 694 F.3d at 195).  Thus, evaluation of the IEP must be based only on information available to the parent at the time he or she was considering the IEP and the school district's proposed placement, and not on retrospective evidence that came to light after the parent chose to reject the district's placement and enroll the child in private school.  *See, e.g.*, *id.*; *R.E.*, 694 F.3d at 188.

"Under New York's Education Law § 4404(1)(c), the local school board bears the initial burden of establishing the validity of its plan at a due process hearing.  If the board fails to carry this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *R.E.*, 694 F.3d at 184 (citing *Cerra*, 427 F.3d at 192).[3]  The district court retains discretion over whether to award tuition reimbursement.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer *may* require the agency to reimburse the parents for the cost of [private] enrollment.") (emphasis added).

---

[2] The *Burlington/Carter* test is named after two Supreme Court cases:  *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 370, 374 (1985), and *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16 (1993).

[3] "[T]o the extent that a court 'must determine whether the state administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise.'" *Reyes*, 760 F.3d at 215 (quoting *M.H.*, 685 F.3d at 225 n.3).

**C. Section 504 Claims**

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794(a) (2012). The "IDEA and Section 504 are complementary, but they address different injuries and thus require different proof. Specifically, Section 504 offers relief from discrimination, whereas IDEA offers relief from inappropriate educational placement, regardless of discrimination." *Gabel ex rel. L.G. v. Bd. of Educ.*, 368 F. Supp. 2d 313, 333 (S.D.N.Y. 2005).

"A plaintiff may assert a Section 504 claim in conjunction with an IDEA claim on the theory that he has been denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive." *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 517–18 (S.D.N.Y. 2013) (citation and internal quotation marks omitted). "'To recover under the Rehabilitation Act, there must be evidence that: (1) the student is disabled; (2) the student is otherwise qualified to participate in school activities; (3) the school or the board receives federal financial assistance; and (4) the student was excluded from participation in programs at, denied the benefits of, or subject to discrimination at, the school on the basis of her disability.'" *Id.* at 518 (quoting *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010)).

"Since Section 504 relief is conditioned on a showing of discrimination, it requires something more than proof of a mere violation of IDEA—*i.e.*, more than a faulty IEP." *Gabel*, 368 F. Supp. 2d at 334 (citing *J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir. 2000)). Rather, a plaintiff must prove some additional level of "intentional discrimination," which "may be

inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE." *Id.* (citations omitted).

## II. REVIEW OF ADMINISTRATIVE RECORD

### A. Background Facts

A.P. first began receiving special education services in the third grade, when he attended public elementary school PS 192 and was placed in a special education class with a ratio of twelve students to one special education teacher ("12:1 class"). Plaintiff's Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("Pl.'s 56.1") (Doc. 16) ¶ 8. Two years later, during the 2009-2010 school year, A.P.'s fifth-grade teacher recommended to Plaintiff that she have her son evaluated by professional psychologists, given his learning difficulties. *See* Defendants' Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("DOE 56.1") (Doc. 22) ¶ 3.

In the spring of 2010, professionals at The Psychological Center at City College of the City University of New York ("CUNY Psychological Center") evaluated A.P. and issued a report dated August 2, 2010 ("the Evaluation"). *See* Ex. D[4] (Evaluation); DOE 56.1 ¶ 4. The Evaluation diagnosed A.P. with an expressive/receptive language disability, dyslexia, and high levels of anxiety. Pl.'s 56.1 ¶ 13 (citing Ex. D-11, 15). The Evaluation noted that, since the first grade, A.P. had received bi-weekly, thirty-minute tutoring sessions using the Wilson Reading System[5] ("Wilson"), but that those sessions had been "insufficient to jump-start the reading

---

[4] All "Ex." references are to exhibits as they were designated upon being entered into the record by the Impartial Hearing Officer. *See* Impartial Hearing Officer's Findings of Fact and Decision, Case No. 138600 (July 18, 2012) (Doc. 1, Ex. A), at 17.

[5] "The *Wilson Reading System* is a resource to teach reading with structured phonics. It is a research-based structured language program that includes multi-sensory, systematic, direct, and diagnostic instruction. It teaches total word structure for encoding and decoding, and it also emphasizes fluency." *Kathryn F. v. W. Chester Area Sch. Dist.*, No. CIV.A. 12-6965, 2013 WL 6667773, at *5 n.7 (E.D. Pa. Dec. 18, 2013) (citing administrative

process." Ex. D-15; Pl.'s 56.1 ¶ 14. The Evaluation concluded that A.P. was a "non-reader" and "unable to read or spell at the most basic level of connecting sounds with symbols." Pl.'s 56.1 ¶ 15 (quoting Ex. D-15).

Based on various assessments of A.P.'s academic performance and behavior, the Evaluation recommended that all of A.P.'s instruction should be "multi-sensory" and, "[w]henever possible," employ "visual/tactile materials that allow him to reason in the moment," because A.P. was best able to assimilate information "through seeing, touching, and manipulating objects." *See* Ex. D-6 to D-9, D-16. With respect to reading in particular, the Evaluation made four distinct recommendations.

- *First*, and most relevant to the instant suit, the Evaluation recommended that A.P. "receive intensive and specialized reading instruction." Ex. D-15. Citing a 2003 book on dyslexia, the Evaluation listed the "criteria" that "must" be met in order for the instruction to "be effective":

  - "Intense Instruction: Delivered no less than 4-5 times per week, with a group of no more than 3 students." *Id.*

  - "High Quality Instruction: Delivered by a reading teacher who has received recent training in scientifically-based methods for teaching reading." *Id.*

  - "Sufficient Duration: Approximately 150-300 hours of intensive instruction (or 90 minutes per day 5 days per week for 1-3 years), continued until the child is reading fluently at grade level." *Id.*

- *Second*, the Evaluation "strongly recommended that the [DOE] finance [A.P.'s] tuition at a specialized school for children with language disabilities, and/or at a private educational institution specializing in intensive, multi-sensory, scientifically-based methods for teaching reading…." *Id.*

- *Third*, the Evaluation recommended that A.P.'s "significant strengths in the visual-spatial realm, as well as his abstract reasoning abilities, should be mined as resources for reading remediation," concluding that "multi-sensory reading interventions will prove most effective in helping [him] learn to read." *Id.*

---

record); *see also Wilson Reading System*, Wilson Language Training, http://www.wilsonlanguage.com/programs/wilson-reading-system (last visited Nov. 11, 2015).

- *Fourth*, the Evaluation recommended that A.P. "receive a central auditory processing evaluation." *Id*.

In September 2010, still unable to read, A.P. began sixth grade at a new public middle school, MS 326, where he was again placed in a 12:1 special education classroom. *See* Pl.'s 56.1 ¶¶ 21–24; DOE 56.1 ¶¶ 9–10. On October 14, 2010, a CSE meeting was convened to develop an IEP for A.P. ("2010 IEP"), for immediate implementation during the 2010-2011 school year. Pl.'s 56.1 ¶ 25; DOE 56.1 ¶ 12; *see also* Ex. L (2010 IEP). As part of that process, Plaintiff shared the Evaluation with Sharon Weissbrot, the principal of MS 326 and a member of the CSE, and the resulting 2010 IEP explicitly referenced and discussed the Evaluation. *See* Pl.'s 56.1 ¶ 26; Ex. L-3. The 2010 IEP classified A.P. as "Speech or Language Impaired," and recommended that he continue in the 12:1 special education class. Ex. L-1. In addition, the IEP more than doubled the number of speech/language therapy sessions as compared to A.P.'s prior program, from twice a week to five times a week and from thirty minutes to forty minutes per session, and prescribed one-on-one sessions instead of sessions containing groups of five students. Pl.'s 56.1 ¶ 29; DOE 56.1 ¶ 16; Ex. L-2.

Even with the 2010 IEP in place, A.P. struggled academically during his time at MS 326. Pl.'s 56.1 ¶ 31. By January 2011, A.P. remained a non-reader. *See* Defendants' Response to Plaintiff's Local Civil Rule 56.1 Statement of Material Facts Not in Dispute ("DOE 56.1 Resp.") (Doc. 23) ¶ 33. Frustrated with what she perceived to be a lack of progress, Plaintiff removed A.P. from MS 326 at the start of winter vacation in December 2010, and, in or around January 2011, enrolled him at the Sterling School ("Sterling"), a private school in Brooklyn specializing in instruction of children with dyslexia and language-based learning disabilities. Pl.'s 56.1 ¶¶ 34–35, 68; DOE 56.1 ¶ 22. Sterling provided "multi-sensory instruction, incorporating manipulatives, auditory instruction, videos and other visual tools." Pl.'s 56.1 ¶ 69.

At Sterling, A.P. received English Language Arts ("ELA") instruction in a classroom with a ratio of nine students to two teachers, and also received one-to-one reading instruction using the Orton-Gillingham method, a multisensory method of teaching reading to dyslexic or learning-disabled children.  *See* Pl.'s 56.1 ¶¶ 37–38; Tr. 268–70.[6]  By May 2011, five months after his enrolling at Sterling, A.P. could read at a mid-first grade level.  DOE 56.1 Resp. ¶ 39.

On May 18, 2011, the DOE convened a CSE meeting to develop an IEP for A.P. for the 2011-2012 school year ("2011 IEP" or "IEP").  Pl.'s 56.1 ¶ 41; Ex. 1 (2011 IEP).  The CSE was comprised of Plaintiff, the principal of Sterling (Ruth Arberman), a DOE school psychologist (Lorna Mathieu), a DOE general education teacher, and an independent parent member.  Pl.'s 56.1 ¶ 43; Ex. 1-2.  Prior to the CSE meeting, Ms. Mathieu conducted a classroom observation of A.P. at Sterling and shared her views with the CSE.  *See* Tr. 225–26.  Ms. Mathieu also received, among other things, the Evaluation, a progress report from Sterling, and A.P.'s prior IEP.  Pl.'s 56.1 ¶ 46.  During the CSE meeting, Ms. Arberman personally relayed information about A.P.'s experience at Sterling and participated in the creation of academic goals to be included within the 2011 IEP.  Tr. 206–08, 215, 224–25, 239.

The CSE concluded that, as of May 2011, A.P. was reading at a mid-first grade level. Ex. 1-3.  In the section of the 2011 IEP entitled "Academic Management Needs," the CSE included the following environmental modifications and material resources required by A.P.:

> multi-sensory instruction across the curriculum; hands on activities; spiraling curriculum; concrete sense of success; intense reading remediation; scaffolding and chunking of information; content vocabulary enhancement; visual aids (e.g., charts, maps, graphs, numberline, templates, visual schedule, graphic organizers, concrete materials); additional time to process responses and to complete assignments; frequent task changes and short breaks to maintain focus; review and repetition of previously presented concepts; and preview of new vocabulary before reading.

---

[6] "Tr." references are to the transcript of the impartial hearing held before the Impartial Hearing Officer on June 11, 2012, June 19, 2012, and June 22, 2012.

Ex. 1-4.  The IEP also set forth thirteen annual academic goals, many of which aspired to have A.P. reach second-grade levels on reading comprehension, phonetics, reading fluency, sight word vocabulary, and spelling skills.  Ex. 1-7 to 1-10.

The IEP classified A.P. with a "Speech or Language Impairment."  Pl.'s 56.1 ¶ 50; DOE 56.1 ¶ 24 (citing Ex. 1-1).  The IEP instituted the following specific programming:

1) placement in a self-contained special education class with a 12:1 teacher-to-student ratio (continuing the same placement from the 2010 IEP);

2) five 45-minute periods per week of Special Education Teacher Support Services ("SETSS")[7] (a new addition not present in the 2010 IEP);

3) five 40-minute sessions per week of one-to-one speech and language therapy (continuing the same service from the 2010 IEP); and

4) one 30-minute session per week of counseling (a new addition not present in the 2010 IEP).

*See* Pl.'s 56.1 ¶¶ 50–52; DOE 56.1 ¶¶ 24–26; *compare* Ex. 1-15, 1-17, *with* Ex. L-2, L-10, L-11.

On August 15, 2011, Plaintiff received from the DOE a final notice offering placement at MS 326 for implementation of the IEP.  Pl.'s 56.1 ¶ 62; Ex. 2-1.  Plaintiff testified that she tried calling MS 326 "multiple times to arrange a visit" but could only reach a school secretary, "who then failed to return [her] calls with information on arranging a school visit"—all of which the DOE disputes.  DOE 56.1 Resp. ¶ 63 (citing Tr. 369).  Plaintiff never visited MS 326 after receiving the August 15, 2011 notice.  DOE 56.1 ¶ 28.  On August 23, 2011, Plaintiff, through counsel, sent the DOE a letter stating her intent to enroll A.P. in Sterling for the 2011-2012 school year, citing her belief that the IEP was insufficient.  DOE 56.1 Resp. ¶¶ 64–65; Ex. B.

---

[7] The parties agree that "SETSS is supplemental instruction from a special education teacher who meets with as many as eight children at the same time, including children in general education who are not receiving special education services, to provide supplemental instruction."  DOE 56.1 Resp. ¶ 54 (citing Tr. 154, 168, 218–19).  One period of SETSS in middle school is forty-five minutes long.  *Id.* ¶ 60.

The DOE did not respond with an offer of an alternate program or alternate proposed placement school.  DOE 56.1 Resp. ¶ 66.

In the fall of 2011, Plaintiff entered into an undated enrollment contract with Sterling for the 2011-2012 school year.  Ex. G.  The contract obligated Plaintiff to pay tuition of $38,000 in the event that she failed to obtain funding from the DOE, and to "cooperate fully in all efforts by [her] attorney and the Sterling School's personnel to secure funding from the DOE for [her] child's placement at the Sterling School."  Pl.'s 56.1 ¶ 67 (citing Tr. 370, Ex. G); DOE 56.1 ¶ 29.


**B. Impartial Hearing and IHO's Decision**

On April 24, 2012, Plaintiff timely filed a Due Process Complaint seeking funding for A.P.'s tuition.  Ex. A.  An impartial hearing was convened and took place over three days on June 11, 2012, June 19, 2012, and June 22, 2012, with seven witnesses testifying in total.  The IHO issued his decision on July 18, 2012.  *See* Impartial Hearing Officer's Findings of Fact and Decision, Case No. 138600 (July 18, 2012) (Doc. 1, Ex. A) ("IHO"), at 3–10.  The IHO denied Plaintiff's request for funding and found that the DOE had offered A.P. a free appropriate public education.  IHO at 13–15.

In his decision, the IHO first reviewed each witness's testimony.  The DOE's first witness was Sharon Weissbrot, principal of MS 326, the school that the DOE had proposed to implement the IEP.  Ms. Weissbrot testified to the range of services available at MS 326, including a self-contained 12:1 special education class and a SETSS provider.  IHO at 4.

The DOE's next witness was Vanessa Acevedo, A.P.'s sixth-grade 12:1 teacher, and his prospective teacher in the same class had he gone back to MS 326.  Ms. Acevedo testified to the scope of her middle-school ELA classes, the number and classifications of students in her class,

A.P.'s performance levels and the instruction he received while in her sixth-grade class in 2010, the additional interventions her past dyslexic students had received, and her prior training and qualifications in reading instruction. *Id.* at 4–6.  Ms. Acevedo also said that A.P.'s frequent absences affected his academic development, particularly in reading. *Id.* at 5.

The DOE's next witness was Yomaly Peralta, MS 326's SETSS provider who would have served A.P. had he gone back.  Ms. Peralta testified to her past experience with special education students, her training in reading instruction, the likely instruction she would have provided A.P., and her belief that the IEP's addition of SETSS and her collaboration with Ms. Acevedo would have benefitted A.P. *Id.* at 6.  Ms. Peralta stated, however, that A.P.'s severe deficits would likely have required two SETSS periods per day instead of the one period the IEP required, and also acknowledged that her current students were not as severely delayed as A.P. *Id.* at 6.[8]

The DOE's final witness was Lorna Mathieu, a DOE school psychologist and member of the CSE that developed A.P.'s 2011 IEP.  Ms. Mathieu testified to her belief in the appropriateness of the IEP and the sources of information that informed the development of the IEP. *Id.* at 7.  With respect to A.P.'s enrollment at Sterling, although Ms. Mathieu testified that the school could "absolutely" meet A.P.'s "social/emotional needs" and that A.P. had made "some progress academically" at Sterling, she cautioned that she "[could not] say that [she had] seen significant progress being made when it comes to academics." Tr. 232–34.

Plaintiff's first witness at the hearing was Sterling teacher Toni Caesar, who extensively taught and tutored A.P. from the time he first attended Sterling up through the date of the

---

[8] Ms. Peralta testified that A.P.'s deficits were "so low that he probably would have needed to see me more than once a day," and said that she "could have done more than five [SETSS periods with A.P.] based on what [she] read." Tr. 159–60, 166.

hearing.  Tr. 262–63.  Ms. Caesar testified to her training in, and use of, methods of multisensory reading instruction, her methods of instruction when teaching and tutoring A.P., A.P.'s daily schedule and services while at Sterling, A.P.'s academic needs, and A.P.'s progress from a second-grade level to a mid-second-grade level in reading during the 2011-2012 school year at Sterling.  IHO at 8.  Ms. Caesar also criticized the specific instructional methods in reading that Ms. Acevedo and Ms. Peralta claimed they would have used with A.P. had he gone back to MS 326, and questioned the sufficiency of their training in multisensory reading instruction.  *Id.*  She added that A.P.'s poor attendance at MS 326 was likely due to his lack of academic progress, and that he had "very good attendance" at Sterling.  IHO at 7 (citing Tr. 264).

Plaintiff's next witness was Dr. Patricia Thomas, supervising psychologist at the CUNY Psychological Center and co-signer of the Evaluation.  *Id.* at 8–9.  Dr. Thomas testified that the reading instruction A.P. had received from first grade to fifth grade (*i.e.*, up to the date of the Evaluation) had been insufficient, and reiterated her belief that A.P. needed "a specialized school that is completely oriented towards remediation…for learning disabled students."  *Id.* at 9 (citing Tr. 336).  Dr. Thomas also detailed her reflections on A.P.'s behavior and performance during the Evaluation.  *Id.*

Plaintiff herself was the final witness at the hearing.  Plaintiff testified to A.P.'s significant academic and social progress made during the second half of the 2010-2011 school year and during 300 hours of individual tutoring from Ms. Caesar over the summer of 2011.  *Id.* at 10.  Plaintiff testified to her difficulty in reaching MS 326 staff over the summer of 2011, and her decision not to accept the IEP's placement and enroll A.P. in Sterling once again.  *Id.* Plaintiff, who participated in the May 2011 CSE meeting by phone, also testified that Ms. Weissbrot, during the meeting, stated her belief that A.P. was not dyslexic, but rather had a

speech problem.  *See* Tr. 349–50.  Plaintiff also testified that (i) MS 326 staff attending the CSE meeting told Plaintiff that the school had never before taught a non-reader like A.P., (ii) that everyone at the CSE meeting agreed that MS 326 "couldn't meet [A.P.'s] needs," and (iii) that Ms. Weissbrot informed her staff during the meeting that "they needed to take all the steps needed to be able to help" A.P., including taking "additional programs" and obtaining additional teaching certificates.  *Id.* at 349–52.  The DOE denies that Ms. Weissbrot, or other CSE attendees or MS 326 staff, made these statements.  *See* DOE 56.1 Resp. ¶¶ 27–28.

The IHO concluded that "the program offered by the DOE, more likely than not, would have met A.P.'s needs," and that the IEP and placement at MS 326 "would have provided a free and appropriate education."  IHO at 15.  While the IHO believed that a mere repeat of the 2010 IEP would not have provided a FAPE, the 2011 IEP offered a better program in that it added remediation via SETSS and counseling to address A.P.'s social needs.  *Id.* at 13–15.  The IHO found that both Ms. Acevedo and Ms. Peralta were sufficiently trained, "would have likely focused on remediating the areas of academic skill deficiency," gave "extensive testimony with regard to how they would have worked with A.P.," and would "perhaps…have been successful with A.P. in improving his skills."  *Id.* at 13–14.  The IHO also thought the changes in the 2011 IEP might have had a material effect on A.P.'s attendance, removing that particular obstacle to academic progress.  *Id.* at 14.

The IHO acknowledged the sensible reasons why Plaintiff would choose to enroll A.P. back at Sterling instead of accepting the DOE's offer at MS 326.  Specifically, the IHO noted the difficulty of taking A.P. out of Sterling, the first school at which he had ever made material progress, only to enroll him back into the same school he had struggled in the year before, with the same teacher.  Additionally, the IHO pointed out that the students who ended up in the 12:1

16

class at MS 326 during the 2011–2012 school year had a range of functional levels that exceeded the permissible range under state regulations, which would not have been "a positive factor with regard to the likelihood of A.P.'s success there." *Id.*

Taking everything into consideration, however, the IHO found there were "good reasons to believe that the program the DOE offered would have met A.P.'s needs," perhaps not "as well as Sterling did," but "appropriate[ly]." *Id.* at 14–15.  The IHO concluded that the 2011 IEP put in place "what was needed to provide focused remediation and attention to A.P.'s academic and social emotional skills and needs," and that it was "more likely than not that the program would have provided an appropriate education for A.P." *Id.* at 15.  The IHO thus denied Plaintiff's request for tuition funding. *Id.*[9]


## C. Appeal to the New York State Review Officer

Plaintiff timely appealed the IHO's decision to the SRO on various grounds, and the SRO issued his decision on July 31, 2014. *See* Office of State Review Appeal, No. 12-168 (July 31, 2014) ("SRO") (Doc. 1, Ex. B), at 5–6 (reviewing parties' arguments on appeal of IHO decision).  The SRO denied Plaintiff's claim for tuition funding, agreeing with the IHO and concluding that the 2011 IEP provided A.P. with a FAPE.  SRO at 14.

The SRO first addressed Plaintiff's argument that the Evaluation went ignored by the CSE.  The SRO determined that the evidence in the record did "not support a conclusion that the May 2011 CSE considered the August 2010 evaluation." *Id*. at 10.  However, the SRO then explained that "even if" the CSE did not properly consider the Evaluation, that failure constituted

---

[9] Despite denying Plaintiff's request for private tuition based on the 2011 IEP's substantive adequacy, the IHO nonetheless ruled in Plaintiff's favor on the second and third prongs of the *Burlington-Carter* test, holding that (i) Sterling was an appropriate private placement for A.P., and (ii) the equities of the case favored Plaintiff.  IHO at 13.

only a "procedural" error that did not necessarily deprive A.P. of a FAPE. *Id.*; *see also id.* at 7–8

(reciting the case law establishing that not all procedural inadequacies deprive students of a

FAPE, while substantive inadequacies automatically do so).  The SRO determined that the

record established that the May 2011 CSE relied on more current information regarding A.P. and

provided supports and services in the IEP that were consistent with recommendations contained

in Evaluation.  *See id.* at 10.  Specifically, the SRO found that the CSE considered "more current

information" in the form of the testimony from multiple witnesses about A.P.'s academic levels

as of May 2011, the report from Sterling's principal, Ms. Arberman, and a teacher report from

A.P.'s "current teacher at Sterling."  *Id.* (citing Tr. 206–07, 359–63; Ex. 1-2).  The SRO deemed

it "permissible" under the circumstances for the CSE to rely on this up-to-date evidence over the

year-old Evaluation.  *Id.* (citing *T.G. ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 320,

340 (S.D.N.Y. 2013)).

        The SRO then found that the record reflected "that the May 2011 IEP incorporated each

of the [E]valuation's recommendations that the parent contends were absent from the May 2011

IEP:  namely, multi-sensory academic instruction; intensive reading remediation; and the

provision of 'non-symbolic visual/tactile representations of mathematical quantities, such as

blocks, manipulatives, etc.'"  *Id.* at 10–11 (citing Ex. A-3 (Plaintiff's request for impartial

hearing)).  The SRO cited the IEP's "Academic Management Needs" section to demonstrate the

range of multi-sensory instruction provided.  *Id.* at 11 (citing Ex. 1-4).  The SRO pointed to the

IEP's discussion of alternative programs that were considered, as well as to corroborating

testimony from Ms. Mathieu, to find that the additional five periods of SETSS per week were

explicitly meant to address A.P.'s need for intensive reading remediation.  *Id.* (citing D-16; Tr.

208, 219, 221).  Finally, the SRO found that the IEP's provision of "concrete materials and

hands-on activities" encompassed A.P.'s need in math for "non-symbolic visual/tactile representations."  *Id.* (citing Ex. D-16).  The SRO thus determined that "the CSE incorporated the type of learning strategies that would benefit the student," and that the IEP's recommendations "were consistent with the evaluative information considered by the CSE, as well as with the recommendations set forth in [the Evaluation]."  *Id.* at 11–12.[10]

Lastly, the SRO concluded as a matter of law that Plaintiff could not "prevail on her claims that the assigned public school site would not have properly implemented the May 2011 IEP."  *Id.* at 12–14.  According to the IHO, it was impermissibly speculative, based on Second Circuit case law, for Plaintiff to claim that a FAPE was not provided because MS 326's "SETSS provider was not qualified to provide reading services."  *Id.* at 12–13.  Because A.P. never attended MS 326, Plaintiff could not defeat a facially appropriate IEP by relying solely on "a retrospective analysis of how the district would have implemented the student's" IEP had the student attended "the assigned public school site."  *Id.*  In addition, the SRO found that Plaintiff had waived her argument that the improper range of ages and functional levels in the assigned 12:1 class at MS 326 would have deprived A.P. of a FAPE, because it was not in Plaintiff's original due process complaint.  *Id.* at 9.

The SRO thus concluded that the 2011 IEP offered A.P. a FAPE and denied Plaintiff's request for tuition funding.  *Id.* at 14.[11]  On November 26, 2014, Plaintiff appealed the SRO's decision and filed her complaint in this Court.  Complaint (Doc. 1).  On April 3, 2015 and May

---

[10] In so concluding, the SRO noted that the insufficiency of the 2010 IEP did not invalidate the 2011 IEP, because the two IEPs "differ[ed] in materials respects, most notably in the addition of SETSS and counseling services."  SRO at 12 n.6.

[11] The SRO did not consider the IHO's findings on the rest of Plaintiff's case for tuition funding—whether Sterling was an appropriate private placement, and whether the equities weighed in Plaintiff's favor.  SRO at 14.

1, 2015, respectively, Plaintiff and DOE filed the instant cross-motions for summary judgment. (Docs. 14, 20).

## III. DISCUSSION

### A.  Standard of Review by the Federal District Court

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request.  20 U.S.C. § 1415(i)(2)(C)(i)–(ii).[12]  Though IDEA appeals tend to come before the district court as a motion for summary judgment, the existence of a genuine issue of material fact does not necessarily result in denial of the motion.  *See, e.g.*, *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  "Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational benefits."  *M.H.*, 685 F.3d at 225–26 (citation and internal quotation marks omitted).  "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]."  *Id.*

Courts reviewing administrative decisions under the IDEA must determine whether the decision is supported by a preponderance of the evidence.  *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) (citation omitted).  This review is not, however, "an invitation to the courts to substitute their own notions of sound educational policy for those of the school

---

[12] The parties did not submit any supplemental evidence here, and rely exclusively on the administrative record.

authorities which they review." *Rowley*, 458 U.S. at 206.  Rather, "'[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.'" *C.F.*, 746 F.3d at 77 (quoting *Gagliardo*, 489 F.3d at 112–13).  Both the Supreme Court and the Second Circuit and "have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." *Grim*, 346 F.3d at 380–81 (citing *Rowley,* 458 U.S. at 204–08; *Walczak,* 142 F.3d at 129).  This Court must therefore "give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Id.* at 381 (quoting *Walczak*, 142 F.3d at 129).  "The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'" *C.F.*, 746 F.3d at 77 (quoting *M.H.*, 685 F.3d at 244).

As the Second Circuit has articulated, the level of deference owed by this Court to the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive." *M.H.*, 685 F.3d at 244.  Most critically, the "deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F.*, 746 F.3d at 77.  The Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E.*, 694 F.3d at 189, and the Court's "determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role," *M.H.*, 685 F.3d at 244.  Thus, for example:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.  Decisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress.  Determinations grounded in thorough and logical reasoning should be

provided more deference than decisions that are not. And the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency.

*M.H.*, 685 F.3d at 244 (citations omitted). Finally, although the district court is not prohibited from reversing IHO and SRO decisions that are in agreement, the law in this Circuit counsels strongly against doing so. *See, e.g.*, *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014).

"Ultimately, judicial review of administrative determinations under the IDEA requires the court (1) to conduct an independent review of the administrative record, (2) use a preponderance of the evidence standard, and (3) give deference to the administrative determinations, particularly that of the SRO." *F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, No. 11-CIV-5131 (RKE), 2012 WL 4891748, at *5 (S.D.N.Y. Oct. 16, 2012), *aff'd*, 553 F. App'x 2 (2d Cir. 2014).

## B. Whether the 2011 IEP Was Substantively Adequate

The administrative record in this case fundamentally demonstrates three things, all of which help frame the crux of the parties' positions on appeal. *First*, prior to his enrollment at Sterling in February 2011, A.P. had not yet made meaningful progress in learning to read. *See, e.g.*, Ex. 1-3 (noting, in 2011 IEP, that Sterling teacher reported A.P. was a "non-reader" upon entering the school).[13] The clear implication is that the prior, 2010 IEP was facially insufficient, and thus A.P. would have been denied a FAPE had the DOE provided the identical IEP for the

---

[13] The DOE makes a half-hearted attempt to dispute this fact, *see* Defendants' Reply Memorandum of Law in Further Support of Their Cross-Motion for Summary Judgment ("DOE Rep.") (Doc. 31) 4–6, but the DOE has already conceded that it does not dispute A.P.'s status as a "non-reader" when he started at Sterling. *See* DOE 56.1 Resp. ¶ 36.

2011-2012 school year.  The IHO concluded as much based on sound reasoning and support

from the record, IHO at 13, and since the SRO did not opine on this finding, the Court defers to

the IHO's conclusion about the inadequacy of the 2010 IEP.  *See C.F.*, 746 F.3d at 77 ("[T]he

courts should defer to the IHO's analysis when considering an issue not reached by the SRO.").

   *Second*, up through the May 2011 CSE meeting, A.P. had made some progress in reading

at Sterling.  *See* Ex. 1-3 (describing, in 2011 IEP, A.P.'s progress "from early February [2011]"

and characterizing A.P. as reading at a "mid 1st grade" level by May 2011).  Thus, A.P. likely

would have made similar progress under a new IEP that implemented a program identical or

substantially similar to the instruction A.P. received at Sterling.  Plaintiff asserts that evidence of

A.P.'s progress at Sterling constitutes "evidence that A.P. could learn to read with the intensive

and specialized reading instruction described in the Evaluation."  Plaintiff's Memorandum of

Law in Opposition to Defendants' Motion for Summary Judgment and in Further Support of

Plaintiff's Motion for Summary Judgment ("Pl.'s Opp'n") (Doc. 29) 7.  Although the DOE

disputes that the instruction at Sterling conformed to the Evaluation's requirements, DOE 56.1

Resp. ¶ 37, it nowhere explains or defends this position in any of its moving papers.

   *Third*, the CSE recognized the insufficiency of the 2010 IEP and provided a more robust

program in the 2011 IEP, including by adding extra reading remediation via SETSS, adding

counseling, and modifying the "Academic Management Needs" section of the IEP with more

explicit requirements such as "multisensory instruction across the curriculum" and "intensive

reading remediation."  *Compare* Ex. 1-4, 1-15, 1-17, *with* Ex. L-4, L-10, L-11.

   Both the SRO and the IHO concluded that, given the changes from the 2010 IEP, the

2011 IEP was sufficient and reasonably calculated to confer meaningful educational benefits on

A.P.  Plaintiff both attacks the quality and reasoning of these decisions, arguing that neither is

entitled to deference, and asks this Court to conclude that the 2011 IEP did not contain sufficient individualized education programming to ensure that A.P. progressed, particularly in reading. Critically, Plaintiff defines "sufficient" by exclusive reference to the Evaluation, taking the position that the 2011 IEP did not provide a FAPE *because it did not adopt in full the Evaluation's recommendations*.[14]  The DOE, in addition to advocating for deference to the decisions below, responds that neither the law nor the record required the CSE to adopt the Evaluation in full, and that the additions to the 2011 IEP made it both reasonably calculated to confer meaningful educational benefits and consistent with the recommendations in the Evaluation.[15]

Thus, there are two essential questions before this Court.  First, were the decisions of the SRO and IHO sufficiently reasoned so as to warrant deference?  And second, was the 2011 IEP *responsive enough* to the evidence in the record—*i.e.*, A.P.'s lack of progress prior to 2011, A.P.'s progress at Sterling, and the Evaluation's recommendations—so as to provide A.P. with a FAPE?  The latter concerns the substantive adequacy of the IEP, and implicates core issues of educational policy, methodology, and instruction.

With the issues framed as such, it is evident that the case for deference is strong here because the Court's institutional competence is near its lowest ebb.  First, as a general matter,

---

[14] *See* Pl.'s Br. 19 ("The 2011 IEP was inappropriate because it failed to recommend the intensive specialized reading instruction described in the Evaluation, which no one denied was a prerequisite for A.P. learning to read and making any academic progress."); *id.* at 20 (arguing 2011 IEP was inappropriate for failing to recommend a non-public specialized school, per the Evaluation); Pl.'s Opp'n 5 ("[A]ll of the information at the 2011 IEP meeting demonstrated that, in order to learn to read, A.P. required the intensive and specialized reading instruction described in the Evaluation, which the 2011 IEP failed to provide."); *id.* at 8 (arguing that the "overwhelming," "undisputed" evidence before the CSE compelled adoption of the "intensive and specialized reading instruction recommended in the Evaluation").

[15] *See, e.g.*, DOE Br. 21 ("Notwithstanding the fact that the CSE had no obligation to implement the [] Evaluation's suggestions on a rote basis…, the CSE *did* in fact recommend a program that was consistent with and in certain ways exceeded the levels of support proposed in the Evaluation."); DOE Rep. 6 ("[T]he recommended program in this case was in fact entirely consistent with the Evaluation and CSEs are not in any event required to implement expert recommendations on a wholesale basis.").

questions of an IEP's substantive adequacy are ones in which "substantial deference is owed to the judgments of state administrative officers." *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015) (citing *Cerra*, 427 F.3d at 191). "'[C]ourts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Id.* (quoting *Rowley*, 458 U.S. at 208); *see also Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."); *Grim*, 346 F.3d at 382 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers."). The crux of Plaintiff's challenge here is to the duration and quality of the reading remediation required by the 2011 IEP. These "concerns regarding…instructional programming are matters of educational policy, better suited to resolution by a state educational administrative officer rather than the courts." *S.W. ex rel. P.W. v. N.Y.C. Dep't of Educ.*, 92 F. Supp. 3d 143, 161 (S.D.N.Y. 2015) (citing *Rowley*, 458 U.S. at 206; *Grim*, 346 F.3d at 383). Indeed, "[c]ourts have specifically identified the question of whether SETSS [or another type of instructional service] is appropriate as one of these issues of educational policy where a certain degree of deference is appropriate." *Id.* (*citing W.W. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 7196 (AT), 2014 WL 1330113, at *14 (S.D.N.Y. Mar. 31, 2014); *see also J.A. ex rel. N.A. v. N.Y.C. Dep't of Educ.*, 10 Civ. 9056 (DAB), 2012 WL 1075843, at *10 (S.D.N.Y. Mar. 28, 2012) (noting that the SRO is entitled to deference "as a state agency's final determination on questions within its peculiar expertise, including the adequacy of classroom staffing, the number of students to be placed in a classroom, and the educational supports necessary to address the student's specialized needs.") (citing *Walczak*, 142 F.3d at 129). Furthermore, "deference is particularly apt where the IHO and SRO decisions are

in agreement and are based on the same record as that before the district court," which is precisely the case here. *B.K.*, 12 F. Supp. 3d at 360 (citing *A.M. v. N.Y.C. Dep't of Educ.*, 964 F. Supp. 2d 270, 283–85 (S.D.N.Y. 2013)); *see also M.C. ex rel. C.C. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 6968 (AKH), 2015 WL 4464102, at *4 (S.D.N.Y. July 15, 2015) (affording deference particularly where SRO and IHO agreed, based on same record before the court); *C.H. ex rel. F.H. v. Goshen Cent. Sch. Dist.*, No. 11-CV-6933 (CS), 2013 WL 1285387, at *12 (S.D.N.Y. Mar. 28, 2013) (same).

In sum, the rationale for deference to the SRO and IHO in this case is more or less on all fours, and their consistent rulings should be upheld so long as their decisions were adequately reasoned. Plaintiff must therefore mount a particularly persuasive attack on the quality of the decisions to convince this Court to overrule them both. On that front, Plaintiff forcefully contends that the decisions below were inadequately reasoned (1) because they failed to properly support their findings with record evidence, and (2) because they failed to grapple with contrary evidence that demonstrated the insufficiency of the IEP. *See* Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment ("Pl.'s Br.") (Doc. 17) 21–23; Pl.'s Opp'n 14–18.

On this record, however, neither argument is sufficiently persuasive to negate the significant deference due the SRO and IHO on the question of substantive education policy at issue here. And although it is decidedly a close call, the Court concludes that the record adequately supports the ultimate conclusions of both the SRO and IHO. Thus, after an independent review of the record, and affording due weight to the findings of the SRO and IHO, the Court concludes that the 2011 IEP provided A.P. with a FAPE.

### 1. The SRO's and IHO's Findings Were Adequately Reasoned

The SRO adequately justified his conclusion that the 2011 IEP provided a program "consistent with the evaluative information considered by the CSE." SRO at 10–12. Specifically, the SRO correctly reasoned that the CSE incorporated into the IEP the evidence of A.P.'s progress at Sterling, as well as testimony from Plaintiff herself, both of which provided "more current information" about A.P.'s academic needs in May 2011 than the Evaluation did. SRO at 10. Indeed, the record demonstrates that the evidence from A.P.'s five months at Sterling was critical to the IEP's formation. Ruth Arberman, the principal of Sterling, attended the CSE and contributed to its discussion, providing information about A.P.'s functioning and reading levels, as well as a teacher progress report from A.P.'s teacher at Sterling.[16] Tr. 206–08, 215, 224–25. Ms. Mathieu, the only educational expert who testified before the IHO and was also present at the CSE, thoroughly explained the extent to which this Sterling evidence informed different sections of the IEP. The CSE's discussion of A.P.'s intensive reading remediation at Sterling led to "initiating SETSS services and providing goals for the SETSS provider to work on" with A.P.'s 12:1 teacher. *See id.* at 220–21. The CSE drafted the IEP's "Academic Management Needs" section in close collaboration with Ms. Arberman, who personally came up with many of the requirements in the section, and Sterling's "focus on multisensory instruction across the curriculum" was the direct impetus for inclusion of that requirement in the IEP. *See id.* at 220, 225, 238. Ms. Arberman's own views and those of A.P.'s teacher at Sterling also contributed to the formation of the 2011 IEP's "Academic Performance and Learning Characteristics" and "Annual Goals and Short-Term Objectives" sections, and also

---

[16] This particular teacher progress report was not entered into evidence before the IHO and is thus not in the administrative record.

27

provided the basis for the inclusion of extra counseling to treat A.P.'s self-esteem issues.  *See id.*
at 208, 224, 236, 239, 243.  Ms. Mathieu's testimony also suggests that her own classroom
observation of A.P. at Sterling informed at least one of the "Annual Goals and Short-Term
Objectives" in the IEP.  *See id.* at 225–26.  Additionally, testimony from Plaintiff herself
contributed to the CSE's evaluation of the levels of A.P.'s academic and social/emotional
performance, and thus proved critical to the drafting of the IEP's "Academic Performance and
Learning Characteristics" and "Social/Emotional Performance" sections.  *See id.* at 236, 239.

With respect to the Evaluation itself, the SRO was correct as a matter of law that the CSE
was not required to adopt the Evaluation's recommendations wholesale.  Rather, the IDEA
required the CSE only to "consider[]" the Evaluation, but "[c]onsideration does not require
substantive discussion, that every member of the CSE read the document, or that the CSE accord
the private evaluation any particular weight."  *S.W.*, 92 F. Supp. 3d at 159 (citing 34 C.F.R. §
300.502(c); *T.S. v. Bd. of Educ.*, 10 F.3d 87, 89–90 (2d Cir. 1993)); *see also J.C.S. ex rel. J.S. v.
Blind Brook-Rye Union Free Sch. Dist.*, No. 12-CV-2896 (CS), 2013 WL 3975942, at *11
(S.D.N.Y. Aug. 5, 2013) ("[T]he law does not require an IEP to adopt the particular
recommendation of an expert; it only requires that that recommendation be considered in
developing the IEP.") (citing *E.S. ex rel. B.S. v. Katonah–Lewisboro Sch. Dist.*, 742 F. Supp. 2d
417, 436 (S.D.N.Y. 2010) ("The mere fact that a separately hired expert has recommended
different programming does nothing to change the deference to the district and its trained
educators."), *aff'd*, 487 F. App'x 619 (2d Cir. 2012)).[17]

---

[17] The Court notes that the SRO took a conservative, and Plaintiff-friendly, position when it determined that the
record "does not support a conclusion that the May 2011 CSE considered the August 2010 evaluation."  SRO at 10.
This finding is not well supported by the record and arguably does not warrant deference.  Ms. Mathieu testified that
she would always review "psycho-ed" and "assessments" prior to the IEP, though admittedly she could not
remember specifically whether the Evaluation was considered in this case.  Tr. 202, 212.  Plaintiff, however, has not
challenged Ms. Mathieu's representations on this point.  *Cf. F.B. ex rel. L.B. v. N.Y.C. Dep't of Educ.*, 923 F. Supp.
2d 570, 581 (S.D.N.Y. 2013) ("Dr. Pape testified that, per her customary practice, she 'must have' reviewed that

Having so concluded, the SRO found that the IEP "incorporated the type of learning strategies…that the August 2010 private evaluation recommended." SRO at 11. The Evaluation repeatedly invoked the value of a "multisensory approach to reading and spelling, in which speech sounds and the visual symbols they represent are paired with visual, tactile, and motor stimuli," and concluded that "multi-sensory reading interventions will prove most effective in helping [A.P.] learn to read" and help with A.P.'s sequencing and memory deficiencies. Ex. D-6 to D-9, D-15. The IEP thus required that A.P. receive "multi-sensory instruction across the curriculum" and, as the SRO noted, "included several specific strategies to address the student's academic management needs that are multisensory in nature, including hands on activities, visual aids, and concrete materials…." SRO at 11 (citing Ex. 1-4). The Evaluation also recommended that A.P. receive "intensive and specialized reading instruction," consisting of instruction delivered at minimum five times a week for 90 minutes per day, in a group of no more than three students, by a teacher recently trained in scientifically-based methods for teaching reading. Ex. D-15. The IEP, in turn, required reading remediation in the form of five weekly 45-minute periods of SETSS, and also included "intense reading remediation" as an independent requirement in the "Academic Management Needs" section, ensuring A.P.'s reading would receive extra attention not only in the SETSS setting but also within the context of his regular

---

update. The Parents have not offered any basis to challenge that testimony."). Indeed, Plaintiff acknowledges that the IEP "does include some of the Evaluation's observations about tools that…would assist A.P." Pl.'s Opp'n 6 n.4. Furthermore, the Evaluation was at the very least considered indirectly in the context of the 2010 IEP: Ms. Mathieu testified that prior IEP was considered as part of the CSE's review, *see* Tr. 239, and the 2010 IEP contained explicit discussion of the Evaluation, *see* Ex. L-3 to L-4. *Cf. T.G. ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 320, 340–41 (S.D.N.Y. 2013) ("Ms. Fochetta testified that Dr. Nightingale's evaluation was incorporated into the 2010–2011 IEP, which was itself reviewed by the CSE in 2011 and used as a starting-point for the 2011–2012 IEP. Therefore, the SRO's finding that Dr. Nightingale's report was considered is supported by testimony at the due process hearing and warrants deference.") (citations omitted). In any event, even if the Evaluation was not explicitly considered by the CSE, the SRO concluded that such a procedural violation would not amount to deprivation of a FAPE where the CSE considered and relied on more recent information about A.P.'s progress, and Plaintiff nowhere challenges that conclusion. *See* SRO at 10–11 (citing *T.G.*, 973 F. Supp. 2d at 341.).

12:1 special education class.  Ex. 1-4, 1-15 to 1-16.  Indeed, the SRO relied on portions of the

record to confirm that the purpose of the additional SETSS was explicitly meant for extra

reading remediation, moving in the direction of the Evaluation, SRO at 11 (citing Ex. 1-16; Tr.

208, 219, 221), and the SRO relied on portions of the record to support his conclusion that the

IEP required the "provision of concrete materials and hands-on activities" in order to satisfy the

Evaluation's repeated call for the use of "visual" and "tactile" materials and representations, not

only in reading, but also in math and throughout other areas of A.P.'s curriculum, *id.* (citing Exs.

1-4, D-16).

In sum, the SRO's decision is entitled to deference because it provides sufficient support

for its findings that the 2011 IEP (i) was an adequate plan for A.P.'s education based on the

totality of the evidence before the CSE, and (ii) implemented the type of instruction that the

Evaluation found to be most effective for A.P.[18]

Plaintiff contends that the SRO is not entitled to deference because he "failed both to

address the substantial contradictory evidence in the record and to provide explanation as to why

[he] credited Ms. Mathieu's unfounded assertion over the weight of the evidence."  Pl.'s Opp'n

16.  First, Plaintiff argues that the SRO "never analyzed why he credited Ms. Mathieu's

conclusory testimony" and "failed to cite any other evidence in the record that supported Ms.

Mathieu's conclusion."  *Id.* at 17.  The decision is not deficient, however, simply because the

SRO did not explicitly delineate why he credited the only education expert before him who

actually participated in the CSE.  Furthermore, it is incorrect to say that Ms. Mathieu's testimony

was the only evidence the SRO relied on, because the SRO necessarily considered the Evaluation

---

[18] Notably, consistent with the SRO's conclusion, Plaintiff acknowledged that that the IEP's "Academic
Management Needs" section directly incorporated observations from the Evaluation itself.  *See* Pl.'s Opp'n 6 n.4.

as well as the other evidence before the CSE—including testimony from Ms. Arberman and Plaintiff, in addition to a teacher report from Sterling—in order to conclude that the IEP was consistent with that evidence.  SRO at 10, 12.

Second, with respect to contrary evidence, Plaintiff argues that the SRO "addressed neither the testimonies of Ms. Caesar and Dr. Thomas nor the recommendations in the Evaluation that demonstrated the 2011 IEP to be inappropriate."  Pl.'s Opp'n 17.  The latter part of that argument is plainly wrong, as the SRO specifically discussed the extent to which the IEP "incorporated each of the August 2010 evaluation's recommendations."  SRO at 10–11.  It is true that the SRO did not specifically discuss the testimony from Ms. Caesar and Dr. Thomas, but Plaintiff overstates the degree to which such omissions undermine the persuasiveness of the SRO's opinion.  *Cf. J.F. ex rel. N.F. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2184 (KBF), 2012 WL 5984915, at *6 (S.D.N.Y. Nov. 27, 2012) ("The SRO is required to render a carefully considered opinion; not a perfect one.").  First, the SRO's consideration of much of this testimony would have been redundant because, as Plaintiff herself asserts, both Ms. Caesar's and (especially) Dr. Thomas's ultimate opinions were that A.P. needed the reading instruction that was recommended in the Evaluation.  *See* Pl.'s Opp'n 8 (citing Tr. 270–78, 315–18, 334–37).  Indeed, Plaintiff nowhere points to *specific* testimony that was material to the SRO's determination but went ignored, nor could she, because the gravamen of the Caesar and Thomas testimony simply reaffirmed Plaintiff's core position that the IEP was insufficient for failing to require the reading remediation recommended in the Evaluation, and the SRO did in fact examine that issue explicitly.  *See J.F. ex rel. N.F. v. N.Y.C. Dep't of Educ.*, No. 14-cv-3724 (KBF), 2015 WL 892284, at *5 (S.D.N.Y. Mar. 3, 2015) ("[A]lthough plaintiffs challenge the evidentiary basis for the SRO decision, they do not point to any specific items of evidence that

31

were overlooked by the SRO *and that would have had a material effect on the SRO's decision*….") (emphasis added). Similarly, according to Plaintiff, all of the evidence regarding A.P.'s instruction at Sterling, which includes the bulk of Ms. Caesar's testimony, simply reinforced the need for the "reading instruction described in the Evaluation." Pl.'s Opp'n 7. Again, the SRO's decision grapples with exactly this issue—whether the IEP's recommendations were consistent with those in the Evaluation. SRO at 10–11. The SRO was not required to explicitly rebut all overlapping testimony that primarily served only to corroborate Plaintiff's core position. *See J.S. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 4315 (PAE), 2015 WL 2167970, at *7 (S.D.N.Y. May 6, 2015) (distinguishing "the cases in which courts have declined to afford deference to SRO decisions on the ground that they failed to grapple with contrary evidence" because testimony from parent's witnesses that was omitted from the SRO's decision "added little new information" and "substantially overlapped with and primarily served to corroborate" testimony explicitly addressed by SRO) (distinguishing *F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 514 (S.D.N.Y. 2013); *C.L. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 1676 (JSR), 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013)). "That the SRO here did not explicitly address every witness's testimony does not undermine the Court's conclusion that his decision was generally well-reasoned and persuasive." *Id.*

   In addition, the SRO properly declined to discuss the extensive portions of testimony from Plaintiff's witnesses that were retrospective or speculative, and thus inappropriate for consideration as a matter of law. *See* SRO at 12–14. For example, Ms. Caesar testified to what she perceived to be Ms. Acevedo's and Ms. Peralta's lack of training and expertise in reading instruction. *See* Tr. 273–74, 315–17. But since there was "no guarantee" at the time of the placement that either of these two women would be A.P.'s teacher, their personal qualifications

cannot be invoked to challenge the IEP's substantive adequacy.  *See R.E.*, 694 F.3d at 187

(holding that the "prospective nature" of review of the IEP prohibits reliance on "evidence that a

child would have had a specific teacher or specific aide," because at the time of placement

parents "have no guarantee of any particular teacher," nor can the school district "guarantee that

a particular teacher or aide will not quit or become otherwise unavailable for the upcoming

school year").  The same is true for Ms. Caesar's testimony, Tr. 272–80, about the insufficiency

of particular teaching methods that both Ms. Acevedo and Ms. Peralta claimed they would have

used, and her testimony about the range of student classifications within the 12:1 class at MS

326.  *See J.W. ex rel. Jake W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 605 (S.D.N.Y. 2015)

(rejecting argument about insufficiency of particular teaching methodology that was not required

by IEP, where parent's only evidence of methodology's use came from retrospective testimony

from student's would-be teacher); *M.L. v. N.Y.C. Dep't of Educ.*, No. 1:13-cv-00574 (ALC),

2014 WL 1301957, at *7 (S.D.N.Y. Mar. 31, 2014) ("Under Second Circuit precedent, 'courts

are prohibited from evaluating the adequacy of an unimplemented IEP based on evidence about

the particular classroom in which a student would be placed.'") (quoting *N.K. v. N.Y.C. Dep't of

Educ.*, 961 F. Supp. 2d 577, 590 (S.D.N.Y. 2013)).  Similarly, Plaintiff's own testimony that MS

326 officials made comments to her indicating an inability to effectively serve A.P. do not come

close to proving that the school was "factually incapable" of implementing the IEP, and was thus

properly excluded from consideration by the SRO.  *See K.C. ex rel. C.R. v. N.Y.C. Dep't of

Educ.*, No. 14-cv-836 (RJS), 2015 WL 1808602, at *12 (S.D.N.Y. Apr. 9, 2015) (explaining that

evidence regarding specific proposed placement is permissible only where evidence shows

school was "factually incapable" of implementing IEP or actively planning to contravene IEP).

The rule in this Circuit is that "it is speculative" and impermissible "to conclude that a school

with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates," but "it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." *M.O.*, 793 F.3d at 244 (citing *R.E.*, 694 F.3d at 195). Plaintiff never challenges, nor could she on this record, the *existence* of a self-contained 12:1 class, SETSS provider, counselor, or speech therapist at MS 326—none of her testimony, therefore, "identified a specific requirement in the IEP that the placement will not satisfy." *J.W.*, 95 F. Supp. 3d at 605; *cf. Scott v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 444–45 (S.D.N.Y. 2014) (finding substantive denial of a FAPE where IEP required 12:1:1 program and school administrator informed parents that there was no availability in 12:1:1 class for the upcoming school year). The SRO thus properly refused to rely on Plaintiff's speculative testimony about the predicted quality of MS 326's implementation of the IEP. *See* SRO at 12–14; *cf. M.O.*, 793 F.3d at 245 (rejecting parent's testimony that school site placement was inappropriate based on her own observations rather than based on the school's "lack of IEP-mandated services").

Lastly, the Court notes that the IHO's opinion was also adequately reasoned and, more importantly, directly grappled with the contrary testimony given at the hearing. The IHO acknowledged the closeness of this case, but was ultimately convinced by the addition of five periods of SETSS per week, explaining that the record demonstrated that, in comparison to the prior year, A.P. would have had two special education teachers collaborating on the intensive remediation newly required by the 2011 IEP. *See* IHO at 13, 15. The IHO also reasoned that the 2011 IEP's addition of counseling was reasonably calculated to address A.P.'s social needs, which, together with the added remediation, may have improved his attendance, "allowing him to attain greater benefit from Ms. Acevedo's 12-1 class." *Id.* at 14.

The IHO's treatment of contrary testimony was also greater than that found in the SRO's opinion. *Cf. M.H.*, 685 F.3d at 246 ("[I]t is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment."). The IHO summarized the major points of the testimony of all three Plaintiff's witnesses, and provided a sympathetic articulation of the reasons that Plaintiff likely decided not to accept the MS 326 placement. IHO at 7–10, 14. While Plaintiff maintains that the IHO did not consider testimony from Ms. Caesar and Dr. Thomas, Pl.'s Br. 21, this is belied by the IHO's specific overview of testimony from both those witnesses and his specific conclusion that the IEP would be "appropriate" even if it would not have met A.P.'s needs as well as Sterling did, a comparison demonstrating that the IHO did in fact consider the Sterling evidence. IHO at 7–9, 14–15. Likewise, the IHO's review of the testimony of Dr. Thomas, one of the supervisors of the Evaluation, ensured the Evaluation would be considered. That the IHO (or indeed the SRO) credited testimony from DOE's witnesses over that of Plaintiff's witnesses "is not a basis for this Court to dispute" the IHO's findings. *H.W. ex rel. M.W. v. N.Y. Educ. Dep't*, No. CV 13-3873 (SIL), 2015 WL 1509509, at *17 (E.D.N.Y. Mar. 31, 2015); *see also M.H.*, 685 F.3d at 258 ("The IHO's determination was based on his assessment of the credibility of the witnesses testifying before him, and his own understanding of educational methodology. It was entitled to deference on that basis.") (citing *Grim*, 346 F.3d at 383). Finally, while Plaintiff is correct that the IHO's opinion included some reasoning that appeared to rely on impermissibly speculative testimony, Pl.'s Br. 21–22, the DOE is correct that such impermissible reliance does not matter so long as there is "sufficient *permissible* evidence" supporting the administrative officer's

conclusion, Defendants' Memorandum of Law in Support of Their Cross-Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("DOE Br.") (Doc. 21) 15 (quoting *K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, 530 F. App'x 81, 85 (2d Cir. 2013)).[19]

### *2. The SRO's and IHO's Conclusions Were Supported by the Record*

Keeping in mind the due weight afforded to the SRO's findings, an independent review of the record reveals that the SRO and IHO's joint conclusion that the IEP was substantively adequate is supported by sufficient evidence in the record.  *See D.N. ex rel. G.N. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 2526 (LGS), 2015 WL 925968, at *10 (S.D.N.Y. Mar. 3, 2015) ("The SRO's determination is supported by a preponderance of the evidence and accordingly merits deference.").

Each of the DOE's witnesses before the IHO testified that the IEP was reasonably calculated to provide educational benefits to A.P.  Ms. Acevedo, A.P.'s prospective 12:1 teacher at MS 326, noted that her past students with severe dyslexia received "additional services" like SETSS and speech therapy in order to supplement in-class interventions, and she agreed with the 2011 IEP's recommendation to add SETSS where a student was otherwise struggling in a 12:1 class.  *See* Tr. 94, 126–27.  Ms. Peralta, A.P.'s prospective SETSS teacher at MS 326, testified that A.P. would benefit from additional reading instruction "besides what the regular ed students are using," such as the Wilson methodology, one example of the type of multi-sensory reading

---

[19] Plaintiff could also be understood to implicitly argue that the IHO applied the wrong standard of review when it admitted it was "not even sure that A.P. would actually learn to read," but instead stated its conclusion that it was "more likely than not" that the IEP provided a FAPE.  Pl.'s Br. 21; *see also* Pl.'s Opp'n 14.  The Court's reading of Plaintiff's papers is that this argument is meant only to support the contention that the IHO engaged in impermissible speculation when it relied on testimony from the MS 326 witnesses about services they claimed they would have provided, beyond the services set forth in the IEP.  In any event, and given the absence of any case law to support the implicit standard-of-review argument from Plaintiff, the Court finds that the IHO's articulation of its conclusions was sufficiently faithful to the proper standard of review.  *See* DOE Rep. 9 (citing Second Circuit's "likely to produce progress, not regression" standard from *Cerra*, 427 F.3d at 195).

instruction that the IEP calls for.  Tr. 159; *E.S.*, 742 F. Supp. 2d at 439 (describing the Wilson

Program as "multisensory reading instruction"), *aff'd*, 487 F. App'x 619 (2d Cir. 2012);

*Schreiber*, 700 F. Supp. 2d at 538 (describing "reading instruction in the Wilson Program" as "a

multi-sensory reading program").  Ms. Peralta also testified that she "underst[ood]" why SETSS

was added to A.P.'s IEP, because he "need[ed] an individualized program" for reading.  Tr. 164.

Ms. Mathieu, the DOE psychologist who was a member of the May 2011 CSE, testified that

SETSS was added because A.P. "could benefit [from remediation] services in reading—

specifically in reading and writing," and stressed that she "ardently believe[d] that a small class

with the remediation services, with services of SETSS, would also benefit [A.P.]."  Tr. 219, 232.

She also testified to her belief that the IEP met A.P.'s social needs via counseling, and to her

agreement with the academic-management needs set forth in the IEP.  Tr. 235, 244–45.[20]

The record also supports the IEP's placement of A.P. into a self-contained 12:1 special

education class located within a traditional public school.  The IDEA required the CSE, to the

"maximum extent appropriate," to ensure A.P. was placed in the "least restrictive environment,"

i.e., "educated with children who are not disabled" rather than in "special classes, separate

schooling, or other removal," unless the "nature or severity" of A.P.'s disability was such that

"education in regular classes with the use of supplementary aids and services cannot be achieved

satisfactorily."  20 U.S.C. § 1412(a)(5)(A).  Thus, "[a]fter considering an appropriate continuum

---

[20] To be sure, Plaintiff's witnesses testified that the IEP did not offer sufficiently intensive reading remediation to constitute a FAPE, and Ms. Peralta even suggested that A.P.'s deficits were so severe as to warrant two periods of SETSS per day rather than one.  Tr. 160.  While this evidence supports Plaintiff's position, "it is not the Court's function to weigh the credibility of various witnesses at the administrative level, but rather, to determine whether there is a preponderance of the evidence in the record to support the SRO's determination."  *E.F. ex rel. F.F. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2217 (MKB), 2013 WL 4495676, at *26 n.16 (E.D.N.Y. Aug. 19, 2013) (citing *M.H.*, 685 F.3d at 240).  Such a preponderance exists on this record, and the Court is particularly wary of rejecting the consensus testimony of the DOE's witnesses on matters of core education methodology.  *See A.S. ex rel. S. v. N.Y.C. Dep't of Educ.*, 573 F. App'x 63, 66 (2d Cir. 2014) ("[T]he school district's witness testified that TEACCH was an appropriate instructional method for A.S.  We are required to give particular deference to state educational authorities on the issue of educational methodology….") (citing *Rowley*, 458 U.S. at 207).

of alternative placements, the school district must place each disabled child in the least restrictive educational environment that is consonant with his or her needs." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 161 (2d Cir. 2014). The CSE did just that. As the IEP makes clear and Ms. Mathieu confirmed, placing A.P. in a District 75 program[21] without any exposure to general education students was considered and rejected as "too restrictive," based on A.P.'s physical, social/emotional, and cognitive needs. Ex. 1-16; Tr. 210. Likewise, Ms. Mathieu testified that placement in a private specialized school, such as Sterling, was also rejected as too restrictive, presumably for the exact same reason. Tr. 211. Bolstering this reasoning, Ms. Weissbrot, the MS 326 Principal, testified to the importance of exposing her students in the self-contained 12:1 special education class to her general education students. *See id.* at 44–45. On the other hand, both the IEP itself and Ms. Mathieu confirm that the CSE considered and rejected placement in an Integrated Co-Teaching classroom[22] because it was not restrictive enough, given A.P.'s severe learning delays and the large class size involved. Ex. 1-16; Tr. 220. The record thus supports the IEP's balancing of A.P.'s educational needs with the mandate of the IDEA to place the child in the least-restrictive environment.

Furthermore, a preponderance of the evidence demonstrates that the IEP's programming requirements could be implemented so as to fulfill the academic management needs and goals set

---

[21] District 75 is the DOE's separate system of schools and home and hospital programs that "provides citywide educational, vocational, and behavior support programs for students who are on the autism spectrum, have significant cognitive delays, are severely emotionally challenged, sensory impaired and/or multiply disabled." *About D75*, NEW YORK CITY DEPARTMENT OF EDUCATION, http://schools.nyc.gov/Academics/SpecialEducation/D75/AboutD75/default.htm (last visited Nov. 2, 2015).

[22] "Integrated Co-Teaching (ICT) classrooms include students with and without disabilities and have two teachers, a general education teacher and a special education teacher. The teachers work together throughout the day to adapt and modify instruction for [students] and make sure the entire class has access to the general education curriculum. Students may be in an ICT classroom all day or for a portion of the day." *Integrated Co-Teaching*, NEW YORK CITY DEPARTMENT OF EDUCATION, http://schools.nyc.gov/Academics/SpecialEducation/programs/environment/ict.htm (last visited Nov. 2, 2015).

forth in the IEP, none of which Plaintiff specifically challenges.  For instance, Ms. Acevedo

explained the ways in which a student like A.P. could receive the "intensive reading

remediation" required by the IEP at least partially within the 12:1 classroom setting.  *See* Tr. 74–

78, 103–04, 112–13.  The testimony from Ms. Caesar, A.P.'s teacher at Sterling, confirmed that

such individualized remediation was generally possible, and desirable, within the context of a

class with a larger teacher-to-student ratio.  *See* Tr. 271–72 (describing the 1:1 and 2:1 tutoring

that took place within A.P.'s 9:2 class at Sterling).  The record thus reflects that requirements in

the IEP's "Academic Management Needs" section, such as multi-sensory instruction across the

curriculum and intensive reading remediation, "would be easy to implement in a small class

setting with the flexibility to individualize the curriculum to meet the student's need."  *E.S.*, 742

F. Supp. 2d at 439.  Ms. Peralta testified to the same type of flexibility in the provision of SETSS

to A.P.  *See* Tr. 160–61, 176–78, 190–93.[23]  Additionally, Ms. Acevedo's testimony

demonstrates that "multi-sensory" instruction in "all subjects" and the instructional technique

known as "scaffolding"—both of which are expressly listed as academic management needs in

the IEP—can both be deployed within the 12:1 classroom setting.  Tr. 102, 137–39; Ex. 1-4.  Ms.

---

[23] Contrary to Plaintiff's position, none of this testimony is impermissibly retrospective, and neither the SRO nor this Court relies on speculative testimony that changes the IEP's facial requirements in order to conclude that those requirements provided a FAPE.  *See D.A.B. ex rel. D.B. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 344, 361 (S.D.N.Y. 2013) (noting that the adequacy of IEPs cannot turn on "testimony and exhibits that were not before the CSE about subsequent events and evaluations that seek to alter the information available to the CSE").  Rather, a teacher's "explanation of [her] classroom techniques is appropriate to the extent it explains how the goals and services in the IEP would be realized" and "explains how the DOE would meet the need listed in the IEP."  *W.W.*, 2014 WL 1330113, at *14 (*citing R.E.*, 694 F.3d at 186).  This type of "explanation" testimony is permissible because the flexibility and differentiated instruction that various staff-to-student ratios and classroom settings allow for were, in the general sense, knowable at the time of the CSE's placement decision.  *See R.E.*, 694 F.3d at 187 ("In determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision.") (citations omitted).  It is appropriate to rely on evidence explaining how specific IEP requirements would operate in practice to achieve the IEP's required academic needs, even if it is not appropriate to rely on evidence claiming that a student would receive services *above and beyond* what the IEP requires on its face.  *Cf. id.* ("[I]f a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this structure operates and why it is appropriate.  It may not introduce evidence that modifies this staffing ratio (such as testimony from a teacher that he would have provided extensive 1:1 instruction to the student).").

Acevedo's further testimony about collaboration with the school's SETSS provider, Tr. 80, was corroborated by testimony from Ms. Peralta, who explained that SETSS can integrate similar material from A.P.'s 12:1 class, reiterating and repeating things such as sight vocabulary, yet another academic management need in the IEP, Tr. 162–63, 175; Ex. 1-4.  Ms. Mathieu also corroborated this testimony, noting that the CSE initiated SETSS services and provided new goals and academic management needs on which the SETSS provider and special education teacher could "collaborate amongst themselves" to meet A.P.'s needs and academic goals.  *See* Tr. 220–21.  Indeed, the IHO relied on this testimony to conclude that the necessary intensive reading remediation would be provided by both "the SETSS class as well as the 12-1 class." IHO at 15.  Plaintiff, therefore, neither challenges the facial sufficiency of the "Academic Management Needs" or "Annual Goals and Short-Term Objectives" sections of the IEP, nor marshals a preponderance of the evidence demonstrating that the programming required by the IEP would not satisfy those needs or meet those goals.[24]

### 3. The Court Defers and Adopts the SRO's and IHO's Conclusions

Plaintiff's case ultimately falls short because she proffers the Evaluation as the sole metric by which to measure whether the IEP provided a FAPE, but neither the case law nor the evidence in the record establish that the IEP would be *per se* insufficient if it did not match the Evaluation's prescribed minutes of reading remediation, class size, or teacher qualifications. And indeed, the record *does* demonstrate that the IEP's required reading remediation was at least comparable to the Evaluation's recommendations.  While the IEP recommends less reading

---

[24] Plaintiff does not dispute the DOE's contention that she fails to challenge the sufficiency of the IEP's stated goals. DOE Br. 18–19; *cf., e.g.*, *W.W.*, 2014 WL 1330113, at *12–13 (assessing plaintiff's challenge that "the goals in the IEP were inadequate").  She also does not assert a challenge to the sufficiency of the IEP's "Academic Management Needs" section.  *Cf. F.B. ex rel. L.B. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 3902 (PAE), 2015 WL 5564446, at *19 (S.D.N.Y. Sept. 21, 2015) (assessing challenge to IEP on grounds that academic management needs portion failed to include sufficient detail).

remediation, the difference is not dramatic.[25]  Moreover, even though the IEP admittedly does

not require that A.P. receive reading remediation in groups of three or fewer students, as the

Evaluation recommends, A.P.'s SETSS periods would never contain more than eight students at

a time.  *See* Tr. 218–19 (SETSS can range from one to eight students).  More to the point, both

Ms. Acevedo and Ms. Peralta testified extensively about the individualized and differentiated

reading instruction that is theoretically possible within both the 12:1 classroom and the SETSS

context.  *See id.* at 74–78, 103–04, 112–13, 160–61, 176–78, 190–93.  And as for Plaintiff's

contention that the IEP failed to meet the Evaluation's requirement that A.P. be taught by a

"reading teacher who has received recent training in scientifically-based methods," testimony

from Ms. Acevedo and Ms. Peralta strongly suggests that the effect of the IEP's requirements of

"multisensory instruction" and "intensive reading remediation" would be to force A.P.'s

prospective reading teachers to adopt instructional methodologies similar to the Orton-

Gillingham method, which was being used on A.P. during his time at Sterling to apparent

success.  *See* Tr. 184, 192–94 (Peralta testimony that she could use three types of multi-sensory

instruction, including Wilson and Orton-Gillingham, to meet the IEP's requirements); *id.* at 75,

77 (Acevedo testimony that she would use Wilson with A.P.); *cf. Schreiber*, 700 F. Supp. 2d at

538 (describing "reading instruction in the Wilson Program" as "a multi-sensory reading

program similar to the Orton–Gillingham method"); *Antignano ex rel. R.A. v. Wantagh Union*

---

[25] The Evaluation's recommendations are not crystal clear.  On the low end, the Evaluation puts forward both four periods per week of remediation and 150 hours of remediation as two acceptable minimums.  At the same time, the recommendation also states that five 90-minute periods per week is the required level of remediation.  *See* Ex. D-15.  In comparison, the IEP's requirement of five 45-minute periods of remediation per week via SETSS totals 138 remedial hours during the school year, not counting any remediation A.P. would receive within the context of his 12:1 classroom.  This calculation assumes that this requirement would be implemented by holding one SETSS period on each of the school year's 184 instructional days.  *See* 2011-2012 School Year Calendar, New York City Department of Education (January 24, 2011), http://schools.nyc.gov/NR/rdonlyres/498AE989-7C83-49CE-A90F-8BDEB72E2109/0/Final320112012SchoolYearCalendar20110126.pdf (scheduling 184 instructional days for sixth graders).

*Free Sch. Dist.*, Civ. A. No. 07-2540, 2010 WL 55908, at *13 (E.D.N.Y. Jan. 4, 2010) (finding record evidence supported conclusion that student would benefit from "multi-sensory instruction" in general, not a particular approach such as Orton-Gillingham or Wilson).

The upshot is that the respective recommendations in the IEP and the Evaluation differ in degree, but not in kind or in methodological approach.  The Evaluation did recommend a moderately more intensive program of reading remediation than the IEP, but the record in this case does not allow Plaintiff to rely solely on this distinction to overturn the dual conclusions of the SRO and IHO that the IEP's program would have also provided A.P. with a FAPE.  While not quite determinative, it is nonetheless significant that both the SRO and IHO considered the record and agreed that the IEP provided a sufficient amount of small-group reading remediation for A.P.  Plaintiff's case here is not compelling enough for the Court to substitute its view for the views of the SRO and IHO.

Notably, Plaintiff *does not cite to a single case* in which the district court overturned both administrative decisions below on this type of close substantive question of educational policy. Rather, all of the cases Plaintiff cites in which both SRO and IHO decisions were overturned involve issues that are inapposite here.  *See* Pl.'s Opp'n 20; *see also G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 581–82 & nn.26–27 (S.D.N.Y. 2010) (overturning SRO's and IHO's conclusions that school district satisfied IDEA's requirement for "mainstreaming" and therefore not reaching question of whether the student was otherwise offered a FAPE, and specifically noting that the court was *not* imposing its views on "education policy" when it assessed objective compliance with IDEA's mainstreaming requirement, whereas the court *would* be imposing its views if it were to pick among competing witnesses on proper teaching instruction), *aff'd*, 486 Fed. App'x. 954 (2d Cir. 2012); *T.K. ex rel. L.K. v.*

*N.Y.C. Dep't of Educ.*, 32 F. Supp. 3d 405, 416–19 (E.D.N.Y. 2014) (overturning IHO's and

SRO's findings that bullying did not substantially restrict student's learning opportunities); *V.S.*

*ex rel. D.S. v. N.Y.C. Dep't of Educ.*, 25 F. Supp. 3d 295, 300 (E.D.N.Y. 2014) (where notice to

parent indicated wrong school site placement, overturning SRO and IHO for improperly relying

on retrospective testimony about correct school site, of which parent never received notice, and

for failing to consider parent's right to meaningful participation in site selection process); *D.C.*

*ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 508, 513 (S.D.N.Y. 2013)

(overturning IHO's and SRO's findings, based on impermissible retrospective testimony, that

school site could implement IEP's requirement of a seafood-free environment, and expressly not

reaching other FAPE issues of class size or teaching method).

Unsurprisingly, in the cases Plaintiff cites in which the federal court did overturn the

SRO on a core question of educational methodology, Pl.'s Opp'n 8–9, the court *deferred to a*

*better reasoned IHO decision*, and did so on a choice among potential instructional programs

that were measurably more different than the similar programs of reading remediation at issue

here.  *See C.F.*, 746 F.3d at 81 (disagreeing with SRO, and adopting IHO's conclusion, that

student "required a 1:1 placement" instead of 6:1:1 placement, where unanimous and

uncontested testimony so stated, and where procedural failure to create a behavioral assessment

plan contributed to failure to recommend 1:1 placement); *R.E.*, 694 F.3d at 193–94 (deferring to

better reasoned IHO opinion, where SRO opinion wrongly ignored unanimous consensus that

student required applied behavioral analysis ("ABA") therapy, and IEP failed to require any

ABA therapy);  *M.H.*, 685 F.3d at 252 (deferring to better reasoned IHO opinion, where SRO's

"failure to consider any of the evidence regarding [propriety of ABA treatment]" was "more than

an error in the analysis of proper educational methodology," but rather "a failure to consider

highly significant evidence in the record").  All of these cases thus avoided the peril present here, that the Court may "substitute [its] own notions of sound educational policy for those of the school authorities [under] review."  *Rowley,* 458 U.S. at 206.[26]

Plaintiff is ultimately asking this Court to upset the educational expertise of the SRO and IHO, as well as their credibility determinations among competing expert witnesses, with regard to a choice between two programs of reading remediation that are at least similar in substance. The Court would have to reach this conclusion "despite contrary holdings of the IHO[] and SRO," and despite the Second Circuit's warning that district courts should not choose "between the views of conflicting experts on a controversial issue of educational policy—effective methods of educating dyslexic students—in direct contradiction of the opinions of state administrative officers who had heard the same evidence."  *Grim*, 346 F.3d at 383 (citing *Rowley*, 458 U.S. at 207 & n.29); *see also M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ.*, 583 F. Supp. 2d 498, 507 (S.D.N.Y. 2008) ("The Second Circuit has stated that it has 'not hesitated to vacate district court opinions where the district court erred in substituting its judgment for that of the agency experts and the hearing officer.'") (quoting *Cerra*, 427 F.3d at 195).  Indeed, this "type of second-guessing and re-weighing of competing expert testimony urged by Plaintiff[] is precisely the type of review discouraged by [the Supreme Court in] *Rowley*….[and] the Second Circuit [] in *Grim*…."  *E.W.K. ex rel. B.K. v. Bd. of Educ.*, 884 F. Supp. 2d 39, 56 (S.D.N.Y. 2012) (citations omitted).

---

[26] The same is true for the cases Plaintiff cites to support the proposition that the SRO must grapple with contrary evidence in order to earn deference. Pl.'s Opp'n 16–17 (citing *C.L.*, *F.O.*, and *M.H.*).  The courts in all of these cases were able to defer to better reasoned IHO decisions.  *See C.L. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 1676 (JSR), 2013 WL 93361, at *8 (S.D.N.Y. Jan. 3, 2013) (deferring to "far better reasoned" IHO decision over SRO decision), *aff'd*, 552 F. App'x 81 (2d Cir. 2014); *S.E. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 4163 (LAP), 2015 WL 4092386, at *11 (S.D.N.Y. July 6, 2015) (deferring to agreeing conclusions of SRO and IHO, and distinguishing *F.O.* and *M.H.* because in those cases "there was disagreement between the IHO and SRO").

Thus, upon review of the entire administrative record, the Court concludes that the evidence in the DOE's favor, combined with the deference owed to the SRO and IHO on this substantive assessment of a particular instructional program, compels adoption of the joint conclusions of the SRO and IHO.  The Court so concludes, well aware that the SRO and IHO issued imperfect decisions, but wary of the possibility that even a marginal reweighing of the evidence based on pure *de novo* review could be outcome-determinative, and could result in this Court's imposing its own view of education policy in place of the views of the state's administrative authorities, without a particularly strong basis for doing so.  This is exactly the type of close case in which deference earns its keep.

## C. Remaining Considerations

Having held that the 2011 IEP provided A.P. with a free appropriate public education, there is no need to analyze the remaining prongs of the *Burlington-Carter* test.  *See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) (noting that the court, upon a finding that IEP was adequate, need not evaluate the services provided by the parents or whether equitable considerations affect relief) (citations omitted).

Likewise, since Plaintiff premises her Section 504 claim on the DOE's failure to provide a FAPE, she cannot prevail under the Rehabilitation Act.  *See* Pl.'s Br. 27–28 ("The denial of access to a free appropriate public education on the basis of a child's disability is a violation of Section 504.") (citing *Gabel*, 368 F. Supp. 2d at 333–34).

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and the DOE's motion for summary judgment is GRANTED.  The Clerk of the Court is respectfully directed to terminate the motions (Docs. 14, 20) and to close this case.

It is SO ORDERED.

Dated:      November 17, 2015
            New York, New York

                                        Edgardo Ramos, U.S.D.J.